# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JENNIFER H. FERRY,** | ) | |
| Plaintiff | ) | Civil Action No. 2:20cv00039 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

## I. Background and Standard of Review

Plaintiff, Jennifer H. Ferry, ("Ferry"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ferry protectively filed her application for DIB[2] on June 14, 2018, alleging disability as of October 1, 2017, based on alcoholism and anxiety. (Record, ("R."), at 17, 179-180, 231.) The claim was denied initially and upon reconsideration. (R. at 77-88, 91-106, 112-29.) Ferry then requested a hearing before an administrative law judge, ("ALJ"). (R. at 130-31.) The ALJ held a hearing on June 30, 2020, at which Ferry was represented by counsel. (R. at 39-76.)

By decision dated July 29, 2020, the ALJ denied Ferry's claim. (R. at 17-32.) The ALJ found Ferry met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2022. (R. at 19.) The ALJ found Ferry had not engaged in substantial gainful activity since October 1, 2017,[3] the alleged onset date. (R. at 19.) The ALJ determined Ferry had severe impairments, namely alcohol abuse, alcoholic cirrhosis, anxiety, depression, somatic symptom disorder, gastric/duodenal ulcer and chronic obstructive pulmonary disease, ("COPD"), but he found Ferry did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-23.) The ALJ found Ferry had the residual functional capacity

---

[2] Ferry apparently also filed for SSI benefits. (R. at 186-93.) The record does not contain any adjudication of this claim on the merits. From review of Ferry's SSI application, it appears that her monthly household income likely made her ineligible for SSI benefits. Regardless, Ferry raises no issue on appeal with the handling of her SSI claim.

[3] Therefore, Ferry must show she was disabled between October 1, 2017, the alleged onset date, and July 29, 2020, the date of the ALJ's decision, to be eligible for benefits.

to perform sedentary[4] work with the use of a handheld assistive device for use on uneven terrain or for prolonged ambulation. (R. at 23.) The ALJ found Ferry could occasionally climb, balance, kneel, stoop, crouch and crawl; and she must avoid concentrated exposure to vibration, pulmonary irritants, chemicals and hazards, such as moving machinery or heights. (R. at 23.) He found Ferry could perform simple, routine, repetitive tasks in a work environment free of fast-paced production requirements, involving simple, work-related decisions with few, if any, workplace changes, no interaction with the public and occasional interaction with co-workers. (R. at 23.)

The ALJ found Ferry was unable to perform any of her past work. (R. at 30.) Based on Ferry's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Ferry could perform, including the jobs of an addressing clerk and a document preparer. (R. at 30-31.) Thus, the ALJ concluded Ferry was not under a disability as defined by the Act from October 1, 2017, through the date of the decision, and she was not eligible for DIB benefits. (R. at 32.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Ferry pursued her administrative appeals, (R. at 174-75), but the Appeals Council denied her request for review. (R. at 6-8.) Ferry then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020).

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

This case is before this court on Ferry's motion for summary judgment filed July 19, 2021, and the Commissioner's motion for summary judgment filed August 17, 2021.

## II. Facts

Ferry was born in 1971, (R. at 30, 44, 265), which, at the time of her alleged onset date, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). Ferry graduated high school and attended a couple of years of college. (R. at 45.) She testified that she had prior work experience as a dental assistant. (R. at 45.) Ferry testified that she did not know why she was terminated from her dental assistant job in 2017. (R. at 46.) Ferry later testified that she was terminated because she was making mistakes on the job. (R. at 46.) Ferry admitted that she had become forgetful. (R. at 48.)

Ferry testified that she began drinking in 2010 when her first husband committed suicide. (R. at 49.) At one point, Ferry testified that she had not drunk alcohol since 2018. (R. at 49.) At another point, Ferry said that she quit drinking in February 2020. (R. at 50.) Ferry said that she had walked with the assistance of a walker since February 2020. (R. at 50.) She then testified that she began using a walker in 2018. (R. at 51.) Ferry testified that she suffered from fatigue and weakness daily. (R. at 51-52.) She also testified that she had a lot of problems with balance and falling, and she used the walker whenever she needed it for stability. (R. at 54.) Ferry testified that she spent seven hours out of every eight-hour period lying down. (R. at 52.)

Ferry testified that she had suffered a total of three seizures. (R. at 53.) Ferry testified that she suffered her last seizure in February or March 2020. (R. at 66.) Ferry said that she had experienced problems with her right hand and upper

extremity since she had suffered her first seizure. (R. at 54.) She said she had experienced numbness and difficulty handling, lifting and carrying objects with her right hand. (R. at 55.) Ferry stated that she could use her right hand for repetitive functions for only 10 minutes at a time because of spreading numbness. (R. at 55-56.) Ferry also testified that she could use her hand for only 10-15 minutes before she experienced cramping and locking up. (R. at 56.) Ferry said that she could work in a seated position for only 15 minutes before having to lie down. (R. at 56.) Ferry said that she could stand for only 15 minutes at a time. (R. at 57.) Ferry stated that she could lift and carry only five pounds with her right hand and up to 10 pounds with her left hand. (R. at 57.)

Ferry testified that she suffered panic attacks daily. (R. at 58.) She stated that when she suffered an attack, her heart would race, her hands would shake, and she did not feel safe for up to an hour at a time. (R. at 58-59.) She said that she sometimes experienced two such attacks a day. (R. at 58-59.) Afterward, Ferry said that she felt exhausted for hours. (R. at 59.) Ferry said that she took Prozac, which helped these symptoms some. (R. at 59.) Ferry testified that she felt helpless and hopeless and cried all the time. (R. at 59-60.) Ferry said that she did not go out in public or to shop. (R. at 60.) Ferry stated that she had problems with her memory and with sleeping. (R. at 61.) Ferry stated that she could sleep for only two hours at a time at most. (R. at 62.)

Ferry testified that prior to her hospitalization in 2018, she drank six beers daily. (R. at 64.) Despite being confronted with hospital records from 2020 indicating that she was drinking six to eight beers a day, Ferry testified that she quit drinking alcohol in 2018. (R. at 65.) Ferry later admitted that she did continue to drink socially, maybe one or two drinks once a week. (R. at 65-66.) Ferry stated that she quit drinking entirely after her hospitalization in February 2020. (R. at 66.)

Mark Hileman, a vocational expert, also was present and testified at Ferry's hearing. (R. at 68-75.) Hileman was asked to consider a hypothetical individual of less than 50 years old, with a high school and some additional education and work history as a dental assistant, who had the residual functional capacity to perform light work, who could stand, walk and sit for up to six hours in an eight-hour workday, and who could occasionally climb or balance, stoop, kneel, crouch or crawl, with work limited to one- to two-step tasks, with only occasional decision-making required. (R. at 68-69.) Hileman testified that such an individual could not perform Ferry's past work. (R. at 69.) He stated that a significant number of other jobs existed that such an individual could perform, including jobs as a housekeeping cleaner and a clothing bagger. (R. at 69.)

Hileman then was asked to assume the same hypothetical individual, but who could perform sedentary work,[5] could lift 10 pounds occasionally, could stand and walk for two hours and sit for six hours in an eight-hour workday, could occasionally climb, balance, stoop, kneel, crouch or crawl, would need to avoid concentrated exposure to vibration, pulmonary irritants, chemicals and hazards like moving machinery and heights and would require the use of a handheld assistive device for use on uneven terrain or for prolonged ambulation of 40 to 50 feet, with work limited to one- to two-step tasks, with only occasional decision-making required. (R. at 69-70.) Hileman stated that a significant number of other jobs existed that such an individual could perform, including jobs as a production assembler and a table worker. (R. at 70.) Hileman was asked to assume the same individual, but who was limited to simple, routine, repetitive tasks in a work environment free of fast-paced,

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

assembly-line-like work with only simple work-related decisions, few, if any, workplace changes, no interaction with the public and occasional interaction with co-workers. (R. at 70-71.) Hileman stated that a significant number of other jobs existed that such an individual could perform, including jobs as an addressing clerk and a document preparer. (R. at 71.)

Hileman testified that there would not be any jobs this individual could perform if limited by difficulty sustaining concentration, persistence and pace and adaptability to complete a full workday by missing about one day a week and who needed unscheduled breaks during the normal workday every 30 minutes for 15 minutes at a time. (R. at 71-72.)

Hileman was asked to consider the first hypothetical individual, but who had the residual functional capacity to perform light work, who could stand, walk and sit for up to six hours in an eight-hour workday, who could occasionally climb, balance, stoop, kneel, crouch or crawl, with work limited to one- to two-step tasks, with only occasional decision-making required, but who could not use their right upper extremity for lifting, carrying, fine and gross manipulation or for feeling and touching for more than one-third of the workday due to hand numbness and cramping. (R. at 73.) Hileman stated that there would be no jobs such an individual could perform. (R. at 73.) Hileman also said that there would be no jobs such an individual could perform if limited to sedentary work. (R. at 73-74.) Hileman further stated that, to be employed, a worker needed to not be off task for more than 10 percent of the workday. (R. at 74.) Hileman also said that a worker could not miss two or more days a month. (R. at 74-75.) Hileman also testified that an individual who could not stand, walk and sit for seven and a half to eight hours a day could not perform gainful employment. (R. at 75.)

In rendering his decision, the ALJ reviewed records from Dr. James Campbell, D.O.; Appalachian Healthcare Associates, P.C.; The Life Center of Galax, ("The Life Center"); Mountain View Regional Medical Center, ("Mountain View"); The Health Wagon; Holston Valley Medical Center, ("Holston Valley"); Norton Community Hospital, ("Norton Community"); Wise County Behavioral Health; Frontier Health; William A. Davis Clinic; Wade Smith, M.S., S.P.E., with Bristol Evaluation Services; and Dr. Eddie Brown, D.O.

Ferry saw Dr. James Campbell, D.O., on April 28, 2017, for an initial visit for a complaint of anxiety. (R. at 309-19.) Ferry stated that her anxiety began one to six months ago and was gradually worsening. (R. at 312.) She complained of decreased concentration, excessive worrying, insomnia, muscle tension, nervous/anxious behavior, panic and restlessness. (R. at 312.) Ferry denied chest pain, compulsions, confusion, dizziness, dry mouth, hyperventilation, impotence, malaise, nausea, palpitations, shortness of breath and suicidal ideas. (R. at 312.) Ferry stated her symptoms were moderate and aggravated by family issues, social activities and work stress. (R. at 312.) Ferry said she had recently separated from her husband. (R. at 312.) Ferry specifically denied any musculoskeletal arthralgias and myalgias. (R. at 314.)

Dr. Campbell noted that Ferry was oriented to person, place and time and in no apparent distress. (R. at 314.) Ferry exhibited a normal mood, affect and behavior. (R. at 314.) Dr. Campbell's physical exam of Ferry was, otherwise, normal in all aspects. (R. at 314.) Dr. Campbell diagnosed anxiety and depression, and he prescribed Zoloft and Vistaril. (R. at 313, 315.)

Ferry was admitted for inpatient treatment at Mountain View from February 14-17, 2018, for severe anemia; she also was diagnosed with alcoholic cirrhosis of

her liver without ascites, gastric ulcer, hypokalemia, hypomagnesemia, candida stomatitis and alcohol dependence with withdrawal. (R. at 621-71.) Upon admission through the emergency department, Ferry complained of fatigue. (R. at 632.) Ferry was oriented to person, place and time and was in no distress. (R. at 633.) Her mood, affect and behavior were normal. (R. at 634.) Ferry did complain of some anxiety and tremors, and tremors were noted upon examination. (R. at 669.) Ferry's blood alcohol level upon admission was 339 mg/dL. (R. at 738.) Ferry was admitted for a blood transfusion and further workup. (R. at 634.) Ferry received three units of blood, and further testing revealed that she suffered from a gastric ulcer. (R. at 640, 684-85.) A mental health assessment diagnosed alcohol dependence and tobacco use disorder. (R. at 864.) No other psychological symptom was noted, other than stating that Ferry was "somewhat anxious" and "moderately fidgety and restless." (R. at 864, 990, 992.) Routine assessments of Ferry did note impulsive judgment, intermittent confusion and poor attention and concentration. (R. at 886, 974.) Ferry was discharged on February 17, 2018, to enter inpatient treatment for alcohol abuse. (R. at 640.)

Cassie McAmis, M.Ed., with Frontier Health, saw Ferry at Mountain View for crisis intervention on February 16, 2018, and she arranged Ferry's voluntary admission to The Life Center for inpatient detoxification. (R. at 1251.)

Ferry sought inpatient treatment for alcohol use disorder and a medical detoxification from alcohol at The Life Center from February 17-25, 2018. (R. at 352-55.) Ferry's February 17, 2018, Intake Assessment noted that she had started drinking heavily after losing her job three months earlier, and she needed help to stop drinking alcohol. (R. at 357.) Ferry complained of anxiety, worry, panic and compulsive behaviors. (R. at 359.) She denied any attention/conduct disturbance. (R. at 359.) Ferry reported drinking six or more alcoholic drinks daily. (R. at 360.)

Ferry's Brief Mental Status Exam noted that she was calm, cooperative and relaxed with a normal affect and mood. (R. at 383.) It also noted normal recent and remote memory and good insight, judgment and impulse control. (R. at 383.) The Physical Exam noted no physical complaints or problems. (R. at 383.) Ferry reported no symptoms of withdrawal, including denying any anxiety. (R. at 384.) However, symptoms of anxiety were noted in other admissions records. (R. at 386-88.) Ferry also reported she suffered from anemia and an ulcer. (R. at 384.)

Various records from The Life Center reflect that Ferry failed to fully comply with her recommended treatment program. (R. at 414-24, 495-511.) Ferry's Discharge Summary stated that she was admitted via a contract by Wise County Community Services Board due to acute intoxication and need for medical detoxification from alcohol. (R. at 352.) The Discharge Summary stated that Ferry, upon discharge, had no functional limitations. (R. at 352.) Ferry was referred back to the Wise County Community Services Board with a recommendation to attend five to seven Alcoholics/Narcotics Anonymous, ("AA"), meetings per week. (R. at 352.) The Discharge Summary noted that Ferry had minimal knowledge of chemical dependency or the recovery process and problems with denial, as evidenced by continued use despite negative consequences. (R. at 353.) The Discharge Summary also noted that Ferry suffered from anxiety, a stomach ulcer and anemia. (R. at 355.)

Upon Ferry's discharge from The Life Center, a follow-up appointment was scheduled for her to see Brenda Palmer, L.P.N., C.S.A.C., with Frontier Health at Wise County Behavioral Health on March 1, 2018. (R. at 1249-50.) Palmer noted that Ferry was oriented, denied suicidal or homicidal ideations, and her thought processes appeared to be intact, coherent and logical. (R. at 1249.) Palmer informed Ferry of the AA meetings in the community, as well as the Peer Recovery Group at

Wise County Behavioral Health. (R. at 1249.) She also spoke to Ferry about the use
of the medications Campral and Vivitrol. (R. at 1249.) Ferry advised that she planned
to try to stay clean and sober on her own, but if she could not, she would call to
schedule an intake appointment with Wise Country Behavioral Health. (R. at 1249.)
Ferry did not appear for a follow-up appointment on March 20, 2018. (R. at 1248.)

Palmer conducted the intake process on Ferry on May 15, 2018. (R. at 1247.)
Ferry reported that she had drunk five to six beers at 4 a.m., and Palmer noted at
9:30 a.m., that she appeared to be in alcohol withdrawal. (R. at 1247.) Palmer noted
that Ferry was going to be evaluated by the crisis team for admission to The Life
Center. (R. at 1247.) Palmer noted tremors. (R. at 1219.) Ferry reported drinking
alcohol and using marijuana since age 15. (R. at 1219.) Palmer also noted anxiety
due to withdrawal symptoms. (R. at 1256.)

Ferry was admitted to The Life Center, again, on May 15, 2018, due to acute
intoxication and need for medical detoxification from alcohol. (R. at 526-574.) Upon
her admission, Ferry reported that she had a problem with alcohol and needed help
to get and stay sober. (R. at 530.) Ferry stated that she suffered from a history of an
ulcer, anemia, anxiety and seizure. (R. at 530, 553, 555, 563.) Ferry reported severe
alcohol and marijuana abuse and severe anxiety. (R. at 531.) Ferry reported she
drank six or more alcoholic drinks daily or almost daily. (R. at 536.) Ferry stated she
also smoked marijuana daily. (R. at 537.)

Ferry's Brief Mental Status Exam indicated she was oriented to time, place
and person. (R. at 559.) She was calm, cooperative and relaxed with a normal affect
and mood. (R. at 559.) It also indicated a normal recent and remote memory and
good insight, judgment and impulse control. (R. at 559.)

Ferry suffered a seizure during her intake at The Life Center on May 15, 2018, for which she was evaluated at Twin County Regional Hospital. (R. at 1738-60.) Physical examination revealed that Ferry was alert and in mild distress. (R. at 1741.) All other findings were normal, including that Ferry's back was nontender. (R. at 1742-43.) On neurological examination, Ferry was oriented with normal speech, motor function and sensation. (R. at 1743.) Ferry's mood and affect were normal. (R. at 1744.) A CT scan of Ferry's head revealed no abnormality. (R. at 1747, 1758.)

On May 17, 2018, Ferry's roommate at The Life Center reported that she began acting "altered" and confused and was talking to people who were not there. (R. at 580.) On May 18, 2018, Ferry was increasingly belligerent with staff and yelling. (R. at 583.)  Ferry was discharged on May 18, 2018, against medical advice before her treatment was completed or aftercare could be arranged. (R. at 526, 583.) Her discharge summary listed her diagnoses as alcohol use disorder and cannabis use disorder. (R. at 526.)

Ferry was treated at the emergency department of Mountain View, again, on May 19, 2018, for alcohol intoxication and abuse. (R. at 1059-73.)   Ferry reported that she had walked out of inpatient treatment the day before because she was confused and did not know what she was doing. (R. at 1066.)   Ferry's mother reported that she was confused and "talking out of her head" the previous day. (R. at 1066.) A urine drug screen was positive for the use of amphetamine, marijuana and benzodiazepines.[6] (R. at 1069, 1079.) Ferry admitted to smoking marijuana. (R. at 1069.)   Ferry was discharged when she refused admission for inpatient detoxification to The Laurels. (R. at 1065.)

---

[6] Ferry was treated with Ativan while at The Life Center. (R. at 528, 571, 573.)

Ferry spoke with Palmer on May 21, 2018, requesting a psychiatric evaluation as soon as possible to discuss treatment with Vivitrol. (R. at 1282.) Ferry reported that she left The Life Center. (R. at 1245.) Ferry's mother also spoke with Palmer and reported that Ferry had a seizure at The Life Center, was distraught and left the facility. (R. at 1245.) Her mother reported that Ferry appeared to be suffering from alcohol psychosis and was arrested. (R. at 1245.) She was not allowed to return to The Life Center after being gone for 12 hours. (R. at 1245.) An appointment was scheduled for a psychiatric evaluation on May 25, 2018. (R. at 1245.)

Ferry saw Palmer on May 24, 2018, and reported that she drank too much, needed help and wanted to stop. (R. at 1243.) Ferry promised to take her medication and keep her scheduled appointments. (R. at 1243.) She stated that she wanted to learn how to stay clean and sober. (R. at 1243.) Ferry reported that she drank six to 12 beers daily for the past two years. (R. at 1227.) She also reported smoking marijuana less than once weekly for the past two years. (R. at 1227.) Palmer noted that Ferry had anxiety due to withdrawal symptoms. (R. at 1222.) Ferry began treatment with Vivitrol on May 25, 2018. (R. at 1217, 1235, 1242, 1275, 1292.) She was to return for another injection in 28 days. (R. at 1292.)

Dr. Eleanor Cantrell, M.D., completed a psychiatric evaluation of Ferry on May 25, 2018. (R at 1209-15.) Ferry reported a long history of alcohol abuse with recent seizure and hallucinations related to alcohol withdrawal, which scared her. (R. at 1209). Ferry reported that she began drinking at age 16, with regular and heavy drinking beginning in 2010, on the death of her first husband. (R. at 1209.) She reported increased alcohol consumption after being terminated from her job in October 2017. (R. at 1209) Ferry reported that, upon her most recent admission to The Life Center, she dry heaved the entire way to Galax and needed a wheelchair to get into the facility. (R. at 1209.) Upon her arrival, Ferry said she suffered a seizure

and was transferred to a local hospital. (R. at 1209-10.) After her return to The Life Center, Ferry left and was arrested by the local police and taken to jail. (R. at 1210.) Her mother and sister picked her up from jail and observed that Ferry was "talking out of her head" and seeing things that were not there. (R. at 1210.) She reported seeing things and hearing voices. (R. at 1210.) Dr. Cantrell diagnosed alcohol use disorder, severe. (R. at 1210.)

Dr. Cantrell noted that Ferry's behavior/attitude was calm, cooperative and pleasant, and she had good eye contact. (R. at 1211.) Dr. Cantrell noted no suicidal or homicidal ideations, with Ferry's speech, orientation and memory within normal limits. (R. at 1211.) Dr. Cantrell noted that Ferry's affect was full, her thought process was coherent, her attention/concentration was good, and her insight and judgment were fair. (R. at 1211.) She noted that Ferry was well-groomed and neatly dressed. (R. at 1212.) Dr. Cantrell noted that Ferry provided appropriate answers to questions, conversed effectively and actively participated in treatment discussions and decisions. (R. at 1212.) Dr. Cantrell noted that Ferry's speech was fluent and coherent with normal quality and rate, her psychomotor activity was normal, her mood was euthymic, and her affect was appropriate to mood, circumstance and conversation. (R. at 1212.) Dr. Cantrell reported that Ferry presented no symptoms of psychosis or cognitive impairment and no dangerousness to herself or others. (R. at 1212.) Dr. Cantrell prescribed treatment with Vivitrol injections. (R. at 1213.) Ferry did not keep her follow-up appointment on June 22, 2018, with Dr. Cantrell or for another Vivitrol injection. (R. at 1206-07.) Ferry also did not appear for a follow-up appointment with Palmer on June 25, 2018. (R. at 1205.)

Ferry returned to see Palmer on June 29, 2018. (R. at 1202.) Ferry admitted to continuing to drink alcohol, consuming three to four beers the previous day. (R. at 1202.) Palmer noted that Ferry was oriented, but disassociated at times, and she

appeared to have short-term memory loss and could not recall events clearly. (R. at 1202.) Palmer noted that Ferry was evaluated by Dr. Cantrell and received a Vivitrol injection. (R. at 1202.) Ferry also attended the Peer Recovery Support Group. (R. at 1201.)

Dr. Cantrell also saw Ferry on June 29, 2018, noting that Ferry had not regularly kept her case management appointments. (R. at 1195.)  Ferry told Dr. Cantrell that she had remained sober for 23 days while living with her mother, but she had moved back into her husband's apartment and returned to drinking. (R. at 1195.) Ferry reported drinking two beers the previous day, then stated she drank three beers the previous day. (R. at 1195.) Ferry stated that she did not report for her Vivitrol injection a week earlier. (R. at 1195.) Ferry complained of her stomach bothering her, with no nausea, vomiting or evidence of bleeding. (R. at 1195.) However, she stated that she was out of her medication for her stomach. (R. at 1195.) Ferry claimed that she was attending AA meetings on Tuesday and Thursday nights, but Dr. Cantrell noted that these meeting were held on Monday and Thursday nights. (R at 1195-96.)

Dr. Cantrell noted that Ferry's behavior/attitude was cooperative, and she had fair eye contact. (R. at 1197.) Dr. Cantrell noted no suicidal or homicidal ideations with coherent thought process, full affect, fair attention/concentration and poor insight and judgment. (R. at 1197.) She stated that Ferry was alert, oriented, calm and cooperative. (R. at 1198.) She noted that Ferry's speech was fluent and coherent with normal quality and rate, her psychomotor activity was normal, her mood was euthymic, and her affect was appropriate to mood, circumstance and conversation with no symptoms of psychosis or cognitive impairment.  (R. at 1198.)

On July 2, 2018, Ferry called Palmer complaining that she could not sleep due to a Vivitrol injection. (R. at 1194.) Palmer noted that Ferry continued to sabotage her treatment efforts. (R. at 1194.) Palmer encouraged Ferry to attend a Peer Recovery Support Group and AA meetings. (R. at 1194.) On August 9, 2018, Palmer noted that she had been unable to contact Ferry by telephone and would send a letter stating her case management would be closed if she did not respond. (R. at 1193.) Ferry's case management was closed on September 7, 2018, based on no contact. (R. at 1324.)

Ferry treated with Rebecca Mullins, D.N.P., F.N.P., with The Health Wagon, from January to October 2018. (R. at 1126-37, 1166, 1328-29.) On her first visit, on January 9, 2018, Ferry complained of an unsteady gait for approximately three weeks. (R. at 1136.) She also admitted that she had a problem with alcohol. (R. at 1136.) Ferry complained of depression and loss of balance with a feeling of fluid in her ears. (R. at 1136.) Mullins noted that Ferry's hands shook, and she appeared nervous. (R. at 1137.) Mullins did not note any complaints of pain or panic episodes. (R. at 1136-37.) Ferry stated that she wanted to stop drinking alcohol, but she did not want inpatient treatment. (R. at 1137.) Mullins diagnosed acute sinusitis, depression, anxiety and alcohol abuse. (R. at 1136.)

Ferry returned to see Mullins on February 6, 2018, with complaints of her ears feeling stopped up, balance problems, numbness of her fourth and fifth fingers on her right hand for the previous two weeks and a rapid heart rate. (R. at 1133.) Mullins diagnosed acute sinusitis and tachycardia. (R. at 1133-34.) Ferry voiced no complaints of pain or panic episodes. (R. at 1133.)

When Ferry saw Mullins on March 7, 2018, she reported that she had not drunk any alcohol in the previous three weeks. (R. at 1131.) Again, Mullins did not note any complaints of pain or panic episodes. (R. at 1131.)

Ferry saw Mullins on April 24, 2018, for stomach issues and a recheck of her ears. (R. at 1128-29.) Mullins noted that Ferry was alert, oriented and anxious appearing. (R. at 1128.) Ferry complained of a blocked ear, dizziness when changing positions, anxiety, a depressed mood and alcohol abuse. (R. at 1129.) Mullins did not document any reports of pain, and, in fact, Ferry specifically denied lower back and extremity pain. (R. at 1129.) She also did not document any panic episodes. (R. at 1129.)

Ferry returned to Mullins on May 23, 2018, stating that she had been alcohol free for nine days. (R. at 1126.) Ferry stated that she was attending AA meetings and had an appointment scheduled later in the week with the local community services board, Frontier Health. (R. at 1126.) Ferry denied depression, and she appeared alert, oriented and anxious. (R. at 1126.) Ferry complained only of fatigue, a blocked ear and dizziness when changing positions. (R. at 1126-27.) Ferry specifically denied pain in her lower back, muscles or joints. (R. at 1127.) Mullins did not document any panic episodes. (R. at 1126-27.)  Ferry saw Mullins again on June 29, 2018, to discuss her lab results. (R. at 1166.)

On July 24, 2018, Mullins completed an Assessment Of Ability To Do Work-Related Activities (Physical) form for Ferry. (R. at 1188-90.) There is no evidence that Mullins saw Ferry on this date. Mullins opined that Ferry could occasionally lift and carry up to five pounds and up to three pounds frequently. (R. at 1189.) Mullins stated that Ferry could stand and walk only two hours total in an eight-hour workday and could do so for only 15 minutes at a time and sit for only four hours total and 30

minutes at a time. (R. at 1188-89.) Mullins stated that Ferry could never climb, kneel, crouch, stoop, balance, crouch or crawl. (R. at 1188.) Mullins listed no medical findings to support the above restrictions. (R. at 1188-89.)  She stated that Ferry's ability to reach, to handle, to feel, to push/pull, to see and to speak all were affected by her pain, addiction and nervousness. (R. at 1188.) Despite the fact that Mullins's medical reports mention that Ferry repeatedly denied any back pain, Mullins stated that these limitations were based on low back pain, alcohol addiction and anxiety. (R. at 1188.) Mullins further stated that Ferry was restricted from working around heights, chemicals, fumes, moving machinery, dust, humidity, temperature extremes, noise and vibration as a result of her alcohol addiction, nervous shaking and panic episodes. (R. at 1190.) Mullins also stated that Ferry would miss more than two days of work a month due to her impairments or treatment. (R. at 1190.)

Ferry returned to see Mullins on October 10, 2018, to discuss seizures and withdrawal medications from alcohol. (R. at 1328.)

State agency physician, Dr. William Rutherford, Jr., M.D., performed a medical evaluation of Ferry on November 9, 2018, and opined that Ferry had mild physical issues with no medically determinable impairment that would preclude her from performing normal duty work from a physical standpoint. (R. at 82.) On the same date, state agency psychologist, Jo McClain, Psy.D., completed a Psychiatric Review Technique form, ("PRTF"), stating that Ferry suffered from depression, anxiety and severe alcohol abuse, but she had normal mental status exams when not intoxicated. (R. at 83.) McClain opined that Ferry could perform simple work with moderate limitations in her ability to understand, remember or apply information and to concentrate, persist or maintain pace and mild limitations in her ability to interact with others and to adapt or manage herself. (R. at 83.) McClain also completed a Mental Residual Functional Capacity Assessment of Ferry, stating that

Ferry's ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and to work in coordination with or in proximity to others without being distracted by them was moderately limited, and her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions and to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without a unreasonable number and length of rest period were not significantly limited. (R. at 85-86.) McClain stated that Ferry might have some issues with detailed tasks and concentration, but she would be capable of persisting in simple tasks for two-hour blocks to complete a normal workday/workweek. (R. at 86.)

Ferry was seen by Emily C. Steffey-Stacy, P.M.H.N.P., at the William A. Davis Clinic, to establish care on February 6, 2019. (R. at 1826-41.) Ferry's chief complaint was depression and anxiety. (R. at 1826.) Ferry stated that all she wanted to do was to lie on the couch. (R. at 1826.) Ferry admitted that she was an alcoholic who had been able to refrain from drinking for 27 days a few months earlier, but she had resumed drinking. (R. at 1826.) Ferry stated she began drinking in 2010 after her first husband's death and began drinking more heavily in 2017 after being terminated from her job. (R. at 1827.) Ferry reported a depressed mood, anhedonia, hopelessness, helplessness and worthlessness, decreased energy/fatigue, sleep disturbance, difficulty concentrating, anxiety/nervousness, worry, difficulty relaxing, irritability, dread, night sweats, fever, chills, loss of appetite, congested nose, runny nose, coughing, nausea, vomiting, stiffness, dry skin, numbness, seizure activity, excessive thirst, change in menstrual cycle and easy bruising. (R. at 1827.)

Ferry stated that she had suffered from two seizures in the past while going through alcohol withdrawal. (R. at 1829.) Ferry stated that her husband also was an alcoholic. (R. at 1827.)

Ferry denied any suicide attempt or ever engaging in self-injurious behavior. (R. at 1828.) Ferry stated that she drank six beers daily throughout the day. (R. at 1828.) Ferry stated that she had run out of Paxil approximately a week earlier, but she did not believe it was effective in treating her symptoms. (R. at 1828.) Ferry denied any illegal drug use. (R. at 1830-31.)

Steffey-Stacy noted that Ferry's breath smelled of alcohol, she was awake and alert and tremulous. (R. at 1832.) She stated that Ferry was ambulatory without any assistive devices, and she had a normal gait. (R. at 1832.) Musculoskeletal exam revealed normal tone, bulk and strength with a resting tremor. (R. at 1832.) On mental status examination, Ferry's speech was regular, and thought process was intact. (R. at 1832.) Ferry denied suicidal or homicidal ideations and hallucinations. (R. at 1832-33.) Steffey-Stacy noted Ferry had appropriate judgment, but impaired insight. (R. at 1833.) Ferry was oriented to time, place and person. (R. at 1833.) Her recent and remote memory were intact, and her attention and concentration were good. (R. at 1833.) Her mood was anxious/depressed and jittery, and she had an appropriately interactive affect. (R. at 1833.) Steffey-Stacy noted that she counseled Ferry at length on her alcohol dependence. (R. at 1835.) Ferry was scheduled to return in two weeks. (R. at 1836.)

Ferry returned to see Steffey-Stacy on March 6, 2019, for follow-up care and medication management. (R. at 1854-62.) Ferry reported she was doing pretty good and in better spirits, but was still drinking some. (R. at 1854.), Ferry's mother was present and expressed grave concern throughout the session. (R. at 1854.) Ferry's

mother stated that Ferry's personality had changed, in that she had no motivation and would lie on the sofa all day and watch movies. (R. at 1854.) Steffey-Stacy stated that Ferry's mother appeared very interested in her recovery, but Ferry did not seem ready to commit to sobriety. (R. at 1854.) Ferry's face was swollen/puffy, and the odor of alcohol was present. (R. at 1854.) Ferry's liver enzymes were elevated, and Steffey-Stacy ordered a hepatitis panel, which was negative. (R. at 1854, 1862.) She recommended tapering and discontinuing Depakote, and she recommended that Ferry enter inpatient detoxification. (R. at 1854.) Ferry was not agreeable to enter treatment. (R. at 1854.) Steffey-Stacy told Ferry that, until she treated her alcohol addiction, she would not likely benefit from medication to treat her mood symptoms. (R. at 1854.) Ferry denied any suicidal or homicidal ideations or audio or visual hallucinations. (R. at 1854.)

Ferry was treated at Norton Community on March 7-8, 2019, for vomiting blood and abdominal pain, and she received a blood transfusion. (R. at 1344, 1351-53, 1357, 1374.) Ferry complained of abdominal pain of 12 hours' duration, as well as nausea and vomiting. (R. at 1351.) Ferry reported drinking six to eight beers daily. (R. at 1351.) Ferry's neurological and psychiatric evaluation was normal. (R. at 1352.) Her abdomen was distended and tender. (R. at 1354.)  A CT scan revealed a perforated duodenal ulcer. (R. at 1345-46, 1352.) Ferry was transferred to Holston Valley on March 8, 2018. (R. at 1373.)

Ferry was treated at Holston Valley from March 8-21, 2019. (R. at 1389-1547.) Upon admission, Ferry's chief complaint was abdominal pain with nausea and vomiting. (R. at 1391, 1394.) Ferry reported a history of alcohol dependence with seizures. (R. at 1394.) She reported drinking six to 10 12-ounce beers daily. (R. at 1394.) On physical examination upon admission, Ferry was oriented to person, place and time, but appeared distressed. (R. at 1396.) All systems and examinations

were normal, except for abdominal pain and tenderness, nausea and vomiting. (R. at 1396-97.) Examination of Ferry's neck and musculoskeletal system revealed normal range of motion, and she had a normal mood, affect, behavior, judgment and thought content. (R. at 1397.) It was determined that Ferry was suffering from severe sepsis. (R. at 1399.) Ferry's condition initially began to improve with conservative treatment. (R. at 1403.) However, she later spiked a fever and became tachycardic with an altered mental status. (R. at 1407.)

An exploratory laparotomy celiotomy was performed on Ferry on March 9, 2019. (R. at 1389-91.) Ferry's perforated duodenal ulcer was repaired, and she was diagnosed with acute bilious peritonitis throughout her abdominal cavity. (R. at 1404.) An appendectomy also was performed. (R. at 1404.) Subsequent to her surgery, Ferry suffered respiratory failure; she remained sedated and on a ventilator through at least March 13, 2019. (R. at 1407, 1412, 1420, 1424, 1436-38, 1446, 1452-56.) Ferry was extubated on March 14, 2019. (R. at 1459, 1468.) Ferry was assessed by physical therapy on March 17, 2019, and began therapy. (R. at 1488-91, 1511-12, 1524-25, 1541-43.)

A psychiatry consultation was performed on Ferry by Alexander G. Moore, P.M.H.N.P.-B.C., on March 18, 2019. (R. at 1500-05.) Symptoms of depression and anxiety and a history of alcohol dependence were noted. (R. at 1500.) Ferry was fully oriented and denied any suicidal or homicidal ideations or hallucinations. (R. at 1500.) Ferry complained of mild depression and anxiety. (R. at 1500.) She denied any feelings of hopelessness, worthlessness or uselessness. (R. at 1500.) She did acknowledge intermittent feelings of helplessness related to her current relationship stressors with her husband. (R. at 1500.) Ferry complained of poor sleep due to being hospitalized. (R. at 1500.) No outward evidence of abnormal thought content or

processes, delusional thought content or internal stimuli were observed. (R. at 1500.) Ferry's capacity for abstract thought appeared intact. (R. at 1500.)

Ferry reported two prior psychiatric hospitalizations for alcohol abuse, but she denied any history of suicide attempt. (R. at 1500.) She denied that her alcohol abuse was an attempt to harm herself or take her own life. (R. at 1500.) Ferry stated that she had used alcohol heavily for approximately 10 years, most recently averaging six drinks a night for the past three years. (R. at 1500.) She stated her last alcohol use occurred on the day of her hospital admission, and she denied the use of any substances other than alcohol. (R. at 1500-01.)

Ferry was oriented to person, place, time/date and situation. (R. at 1501.) She appeared disheveled, but was alert, cooperative and maintained good eye contact. (R. at 1501.) Ferry exhibited no abnormal, involuntary movements; her speech was clear, with normal rate and volume; her mood was anxious and depressed; and her thought processes were logical and organized. (R. at 1501.) Ferry's recent and remote memory and her attention and concentration were normal; and her insight and judgment were fair. (R. at 1502.) Ferry stated that she was unsure as to whether she was interested in any further treatment for psychiatric symptoms or alcohol use. (R. at 1504.)

Ferry was discharged from Holston Valley on March 21, 2019. (R. at 1543-46.)

Ferry saw Ramona Boyd, N.P., with The Health Wagon for follow up from her hospital stay on April 8, 2019. (R. at 1877-78.) Oddly, Ferry told Boyd she had been hospitalized for gastrointestinal issues, and the doctors suspected gastroenteritis, but they could not determine what was wrong. (R. at 1877.) Boyd

did note that Ferry had undergone a peptic ulcer repair. (R. at 1877.) Ferry complained of abdominal cramping and pain, diarrhea, nausea, fatigue, dizziness when changing positions, hacking cough from sinus drainage, anxiety, depressed mood and alcohol abuse. (R. at 1877.) Boyd specifically noted that Ferry denied any joint stiffness, muscle aches or painful joints, and there is no mention of any complaint of back pain. (R. at 1877.) On examination, Ferry's lumbar spine was nontender to palpation, she had full range of motion in her cervical spine and extremities, she was alert, oriented and cooperative, her judgment and insight were good, her speech was clear, and she was anxious. (R. at 1878.)

Ferry returned to Boyd on April 22, 2019, for follow up, stating she was doing better and was not drinking. (R. at 1874.) Ferry complained of dizziness when changing positions, but she denied any other symptoms, including joint stiffness, muscle aches, painful joints, sciatica or pain in her lower back, tremor, anxiety or depressed mood. (R. at 1874-75.) On examination, Ferry's back was nontender to palpation, she was alert, oriented and cooperative with good judgment and insight, she had clear speech, and she was anxious appearing. (R. at 1875.)

Ferry saw Boyd, again, on May 14, 2019, for medication refills. (R. at 1872-73.) Ferry denied any symptoms or complaints, including abdominal pain, joint stiffness, muscle aches, painful joints, sciatica, balance difficulty, gait abnormality, low back pain, tremor, pain, anxiety or depressed mood. (R. at 1872.) On examination, Ferry's back was nontender to palpation, and she was alert, oriented and cooperative with good judgment and insight, she had clear speech, and she was anxious appearing. (R. at 1873.)

Dr. Eddie Brown, D.O., of Southern Medical Group, Inc., performed an evaluation of Ferry on May 11, 2019. (R. at 1712-15.) Ferry told Dr. Brown she last

worked in 2017 as a dental assistant, but she alleged that she was then currently disabled due to alcoholism and anxiety. (R. at 1712.) Dr. Brown noted that Ferry's blood pressure was high at 125/90. (R. at 1712, 1713.) Ferry reported that she recently had emergency surgery for a bleeding duodenal ulcer caused by her alcohol use. (R. at 1712.) She also reported suffering from delirium tremens, seizures and the beginning stages of cirrhosis. (R. at 1712.) She reported that she had not consumed alcohol in "quite some time." (R. at 1712.)

Ferry said she was filing for disability due to anxiety, which began in 2017 when she lost her job. (R. at 1712.) She also complained of feeling depressed at times, but denied any suicidal ideations. (R. at 1712.) Ferry reported that she avoided stores and large crowds due to onset of her heart racing. (R. at 1712.) She stated that she took Paxil, which helped some, but she thought she might need her medication adjusted. (R. at 1712.) Ferry denied any use of illegal drugs. (R. at 1713.) Ferry said that she was independent with her activities of daily living. (R. at 1713.)

Ferry complained of recent weight change and change in appetite, heart palpitations, frequent urination and low back pain. (R. at 1713.) Ferry also complained of mood changes, depression, anxiety, difficulty concentrating and difficulty sleeping. (R. at 1713.) Dr. Brown noted on physical examination that Ferry was in no acute distress and ambulated without assistance. (R. at 1713.) Ferry's heart had regular rate and rhythm with no murmur, gallop, click or rub. (R. at 1713.) Her distal pulses were intact, full and equal. (R. at 1713.) Ferry's gait was within normal limits, and she had 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally. (R. at 1714.) She also had 5/5 strength, bilaterally, in all muscle groups, and her reflexes were normal. (R. at 1714.) Ferry showed no sign of muscle asymmetry, atrophy or involuntary movements, no

structural deformity, effusion, swelling, erythema, heat or swelling of any joint. (R. at 1714.) Straight leg raises were negative. (R. at 1714.)

Dr. Brown stated that Ferry did not show any obvious signs of joint tenderness in any region and no signs of joint instability, inflammation or deformity. (R. at 1714.) Ferry was able to sit in no significant distress, walk and stand. (R. at 1714.)

Mentally, Dr. Brown noted that Ferry was alert an oriented to time, place and situation. (R. at 1714.) He noted that Ferry was cooperative and did not appear depressed or anxious. (R. at 1714.) Ferry was able to communicate with no deficits, recent and remote memory weres intact, and she exhibited good insight and cognitive function. (R. at 1714.) Dr. Brown stated that Ferry did not show any signs of mood instability or concentration difficulty. (R. at 1714.) He noted that Ferry was able to hold conversation, respond appropriately to questions and remember instructions. (R. at 1714.)

Dr. Brown opined that Ferry could walk and/or stand for a full workday and could sit for a partial workday with allotted occasional breaks. (R. at 1714.) Dr. Brown stated Ferry's "condition" might be exacerbated by lifting or carrying excessive weight, and he limited her lifting and carrying to less than 10 pounds, but he did not specify the "condition" from which Ferry suffered. (R. at 1714-15.) He also restricted her from excessive bending, stooping and crouching. (R. at 1715.) He diagnosed anxiety and status-post laparotomy. (R. at 1714.) Dr. Brown noted a normal range of motion in all of Ferry's joints, including her cervical and lumbar spine. (R. at 1716.)

Ferry underwent a consultative psychological evaluation by Wade Smith, M.S., S.P.E., with Bristol Evaluation Services, on May 23, 2019. (R. at 1718-21.)

Smith noted, ".... Ferry explained her disabilities by saying, 'I don't have the drive. It seems like my health has gone downhill … when my first husband shot himself, that's when I started the drinking… I don't go out anywhere… I get real nervous around people.'" (R. at 1718.) Smith noted that Ferry was appropriately dressed for the weather and circumstance, and her attitude was cooperative. (R. at 1718.)

Ferry reported that she was widowed at 39 when her first husband committed suicide, and she said she remarried at 41. (R. at 1718.) Ferry said that she graduated high school, never was retained in any grade and never received any special education services. (R. at 1718.) She later attended community college, but did not obtain a degree. (R. at 1718.) Ferry said that she was terminated from her last job as a dental assistant because she had become forgetful, which Ferry attributed to her drinking. (R. at 1718-19.) Ferry said that she suffered from a stomach ulcer, enlarged liver, joint pain, right leg weakness and history of two seizures. (R. at 1719.)

Oddly, Ferry reported that she had never been treated by a counselor or hospitalized for psychiatric treatment. (R. at 1719.) Ferry stated that she then currently took Paxil for anxiety and tremulousness and had just started taking Buspar. (R. at 1719.) Ferry said that she started drinking heavily at age 39 until two months earlier when she was hospitalized for a gastric ulcer. (R. at 1719.) Ferry said that she used to consume six to 12 beers a day, seven days a week. (R. at 1719.) She admitted that she continued to drink two or three beers on occasion. (R. at 1719.) She denied any other history of substance abuse. (R. at 1719.)

Smith noted that Ferry made appropriate eye contact, her hygiene and grooming were good, no psychomotor abnormalities were noted, and she did not appear to exaggerate her symptoms. (R. at 1719.) Ferry reported her mood as generally "bleh" and then currently "okay." (R. at 1719.) Ferry's affect was normal,

stable, full range, normal intensity, congruent to content and fully reactive. (R. at 1719.) Ferry's speech was fluent, grammatical and normal for rate, rhythm, volume, articulation and modulation. (R. at 1719.) Ferry exhibited no looseness of associations or other symptoms of a formal thought disorder. (R. at 1719.) She denied suicidal or homicidal ideations, hallucinations or delusions. (R. at 1719.) Ferry was alert and oriented, her attention appeared intact, and her concentration for short-term tasks was mildly limited. (R. at 1719.) Ferry's recent and remote memories appeared intact, her numerical reasoning was accurate, and her visuospatial ability was within normal limits. (R. at 1719-20.) Smith stated that Ferry's intelligence probably was in the low average range. (R. at 1720.)

Smith diagnosed somatic symptom disorder based on Ferry's reports of continuing pain from her abdominal incision. (R. at 1720.) Ferry reported that she had experienced three to four panic attacks, with the first occurring when she was fired in 2017, and the most recent occurring two weeks earlier. (R. at 1720.) Smith noted that Ferry did not meet the criteria for panic disorder, but he diagnosed unspecified anxiety disorder and moderate alcohol disorder. (R. at 1720, 1721.)

Ferry reported that she would wake, generally, at 7 a.m., sit on the couch and drink coffee and eat breakfast. (R. at 1720.) She stated that she watched crime documentaries on television, fed her dog, did housework, read crime novels and listened to music. (R. at 1720.) Ferry said that she watched television in the afternoon and called her mother and sister in the evening. (R. at 1720.) She said her husband cooked supper. (R. at 1720.) She said that she went to bed at midnight and would bathe every two to three days. (R. at 1720.) Ferry said that she occasionally shopped for groceries, traveling to the store every few months. (R. at 1720.) Smith said that Ferry appeared to have the financial acumen necessary to make her own purchases. (R. at 1720.) She reported visiting her mother every two weeks, and her sister every

two months. (R. at 1720.) She said that she managed her own bank account, but she was not responsible for paying monthly bills. (R. at 1720.) Ferry said that she would dust, sweep, dustmop, load the dishwasher and do laundry. (R. at 1720.) Ferry said that she could follow a recipe and could perform a moderate range of cooking tasks. (R. at 1720.) She denied doing any yardwork. (R. at 1720.) Smith noted that Ferry demonstrated normal psychiatric independence in her daily activities, she performed a moderate range of activities with effectiveness, and she chose her activities appropriately. (R. at 1720.) He stated that Ferry's sustainability of activity was limited by her physiological issues. (R. at 1720.)

Smith noted that Ferry related fairly well to him, and she reported having good relationships with family members. (R. at 1720.) She stated that she had no close friends, but she was close with three of her relatives. (R. at 1720.) Ferry said that she typically had good relations with her neighbors, and she had good relations with her co-workers and supervisors when she was working. (R. at 1720.) Smith said that Ferry's interpersonal skills seemed normal. (R. at 1720.) Smith said that Ferry was capable of managing her own benefits. (R. at 1721.)

Smith stated that Ferry presented a normal level of energy, and her fine and gross motor skills appeared to be within normal limits. (R. at 1721.) Smith stated that Ferry did not seem limited in her ability to understand and remember general items and concepts, and, thus, should be able to comprehend and follow both simple and detailed job instructions. (R. at 1721.) Smith stated that Ferry's concentration and persistence appeared adequate to meet the demands of simple, or some detailed, work-related decisions. (R. at 1721.) He stated that Ferry showed a mildly to moderately limited ability to interact with others in an appropriate manner, but she did not appear limited in her ability to adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precautions. (R. at 1721.) He did state that

her physical problems might detract from her ability to maintain attendance and meet an employment schedule. (R. at 1721.) Smith's report was signed by David Dietrich, Ph.D., a licensed clinical psychologist. (R. at 1722.)

On reconsideration on May 31, 2019, state agency physician, Dr. Robert McGuffin, M.D., completed a Residual Functional Capacity assessment of Ferry. (R. at 101-03.) Dr. McGuffin stated that Ferry could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, and she could stand and/or walk and sit about six hours in an eight-hour workday. (R. at 102.) He stated that Ferry could occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 102.) Dr. McGuffin stated that Ferry had no manipulative, visual, communicative or environmental limitations. (R. at 102.)

On reconsideration, on May 31, 2019, state agency psychologist, Leslie E. Montgomery, Ph.D., completed a PRTF, finding Ferry suffered from depression, anxiety and severe alcohol abuse that did not meet or equal a listed impairment. (R. at 99.) Montgomery stated that Ferry had normal mental status exams when not intoxicated and was able to perform simple work. (R. at 99.) Montgomery opined that Ferry had moderate limitations in her ability to understand, remember and apply information and to concentrate, persist or maintain pace and mild limitations in her ability to interact with others and adapt or manage herself. (R. at 99.) Montgomery also completed a Mental Residual Functional Capacity Assessment, finding that Ferry's ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and to work in coordination with or in proximity to others without being distracted by them were moderately limited, and her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance and be punctual within

customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest period were not significantly limited. (R. at 103-04.)

Mullins saw Ferry on November 20, 2019, for medication refills. (R. at 1868-69.) Ferry stated that she wanted to see a psychiatrist to get help with her depression; she said that she was trying to quit drinking. (R. at 1868.) Ferry said that she quit taking Paxil and Buspar because they were not working. (R. at 1868) Ferry was in no acute distress, and examinations of all systems were normal. (R. at 1868.) Mullins's report records no complaint of any pain, including no complaint of back pain. (R. at 1868.) Mullins also did not state that Ferry exhibited any tremors or shakiness. (R. at 1868.) Mullins diagnosed anxiety and depression, and she started Ferry on Prozac. (R. at 1868.)

Mullins completed an Assessment Of Ability To Do Work-Related Activities (Physical) for Ferry on November 27, 2019. (R. at 1727-29.) There is no evidence that Mullins saw Ferry on this date. Mullins opined that Ferry could occasionally lift and carry up to five pounds and up to three pounds frequently. (R. at 1727.) Mullins stated that Ferry could stand and walk only two hours total in an eight-hour workday, but could do so only 30 minutes at a time, and she could sit for only three hours total and 30 minutes at a time. (R. at 1727-28.) Mullins stated that Ferry could never climb, kneel, crouch, stoop, balance or crawl. (R. at 1728.) She stated that Ferry's ability to reach, to handle, to feel and to push/pull all were affected by her chronic low back pain, nervousness and shaky hands. (R. at 1728.) Again, the only mention of back pain in Mullins's medical reports is that Ferry denied any back pain. Mullins further stated that Ferry was restricted from working around heights, chemicals,

fumes, moving machinery, dust, humidity, temperature extremes, noise and vibration as a result of her chronic back pain, anxiety, nervousness, shaking hands and panic attacks. (R. at 1729.) Mullins also stated that Ferry would miss more than two days of work a month due to her impairments or treatment. (R. at 1729.)

Mullins also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Ferry on November 27, 2019. (R. at 1724-26.) Mullins opined that Ferry had a moderate or more than a slight limitation, but still was able to function satisfactorily, in her ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 1724-25.) Mullins opined that Ferry had a seriously limited or no useful ability to perform all other occupational, performance and personal/social adjustments due to anxiety, shaking hands, panic attacks and limitations in her thought organization and comprehension. (R. at 1724-26.) She stated that Ferry, on average, would be absent from work more than two days a month. (R. at 1726.)

Ferry saw Mullins, again, on December 11, 2019, to obtain medication refills. (R. at 1866-67.) Ferry stated that she wanted her Prozac increased and to be put on seizure medication because the last time she tried to quit drinking she had seizures. (R. at 1866.) Ferry stated that she wanted to start seizure medication before she stopped drinking. (R. at 1866.) Mullins noted that Ferry was in no acute distress and her examination of Ferry was normal in all noted aspects. (R. at 1866-67.) Mullins diagnosed depression, anxiety and alcohol dependence with withdrawal. (R. at 1867.) Mullins increased Ferry's Prozac dosage to 20 mg a day and prescribed Tegretol. (R. at 1867.)

Ferry was seen in the emergency department at Norton Community on February 17, 2020. (R. at 1763-72.) Ferry admitted that she drank eight to 12 beers

daily. (R. at 1763.) Ferry complained of diarrhea, generalized weakness and being unable to walk. (R. at 1764.) Ferry said that she had suffered from an upper respiratory infection for two weeks and had been short of breath for one week with worsening weakness for one week. (R. at 1765.) Ferry denied any pain. (R. at 1765.) Ferry was short of breath with a cough. (R. at 1769.) She complained of myalgia and weakness. (R. at 1769.) Ferry's physical examination was normal, including normal musculoskeletal examination, except tachycardia and pale skin was noted. (R. at 1770.) Ferry was diagnosed with a gastrointestinal, ("GI"), bleed and transferred to Holston Valley. (R. at 1770, 1772.)

Ferry was treated inpatient at Holston Valley from February 17-20, 2020. (R. at at 1773-1825.) Upon admission, Ferry's Internal Medicine History and Physical stated that she was transferred for an acute GI bleed. (R. at 1773.) Ferry gave a history of alcohol abuse, drinking six to eight beers daily for "a long time." (R. at 1773.) Dr. Anna Lynn Dunn, D.O., noted that Ferry had a history of surgical repair of a perforated duodenal ulcer in March 2019, hypertension, gastroesophageal reflux disease, ("GERD"), and nicotine abuse. (R. at 1773.) Ferry reported dark stools and weakness for the past several days. (R. at 1773.) Dr. Dunn noted that Ferry previously had been diagnosed with alcohol dependence, anxiety, chronic obstructive pulmonary disease, ("COPD"), GERD and seizures due to alcohol withdrawal. (R. at 1774.) Dr. Dunn also noted that Ferry then suffered from congestion, sinus pain and pressure, cough, shortness of breath, blood in the stool, diarrhea, nausea, vomiting, arthralgias, dizziness and weakness. (R. at 1775.) Ferry specifically denied any back pain, behavioral problems and hallucinations. (R. at 1775.) Ferry's blood pressure was 141/75. (R. at 1776.) Dr. Dunn noted all normal examinations except for tachycardia. (R. at 1776.) She specifically noted that Ferry exhibited normal ranges of motion and no abdominal tenderness, guarding or rebound. (R. at 1776.) She also noted that Ferry was alert and oriented to person,

place and time. (R. at 1776.) Dr. Dunn assessed Ferry with acute GI bleeding with resultant anemia due to blood loss, alcohol and tobacco abuse, alcoholic cirrhosis of the liver without ascites and cough. (R. at 1777.) Dr. Dunn admitted Ferry and requested a GI consult. (R. at 1777.)

Dr. Adam W. Coe, M.D., saw Ferry for a GI consult on February 18, 2020, and recommended she undergo an endoscopic procedure to examine her stomach. (R. at 1778-81, 1793-99.) Dr. Coe noted that Ferry was "altered" at the time of his examination. (R. at 1793.) Ferry's husband reported a several day history of Ferry having dark stools and deceased intake, with Ferry vomiting blood the previous day. (R. at 1793.) Dr. Coe noted that Ferry remained slightly tachycardic. (R. at 1793.) The endoscopic procedure revealed a large duodenal ulcer, a clotted blood vessel and two tiny ulcerations with no active bleeding. (R. at 1783, 1798-99.) An ultrasound performed on February 19, 2020, showed Ferry's liver was moderately enlarged. (R. at 1819.) Ferry was treated conservatively with medication, and she was discharged home on February 20, 2020. (R. at 1783.)

Ferry called Mullins for medication refills on May 12, 2020. (R. at 1996-97.)

Ferry called Cara Robinson, F.N.P.-B.C., on June 3, 2020, for a phone consultation for gait difficulties, history of seizures and medication refills. (R. at 1992-93.) Ferry reported difficulty with stability with walking and poor memory. (R. at 1992.) Ferry stated her last seizure was two months earlier, with two prior seizures that year. (R. at 1992.) Ferry told Robinson that she had not consumed alcohol in two years, which conflicts with her statements upon her recent hospital admission. (R. at 1992.) Ferry stated that she had experienced being off balance for a year since her second seizure. (R. at 1992.) Ferry also complained of nausea and light headedness, and she advised she used a walker to ambulate. (R. at 1992.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider

whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Ferry argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Specifically, Ferry argues the ALJ erred by failing to give full consideration to Mullins's opinion and by substituting his own opinion as to the severity of Ferry's impairments on her work-related abilities. (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7]

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[8] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

---

medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Ferry argues the ALJ erred by improperly determining her residual functional capacity by failing to give controlling weight to Mullins's opinions as to her work-related abilities. (Plaintiff's Brief at 5-6.) The ALJ found Ferry had the residual functional capacity to perform sedentary work with the use of a handheld assistive device on uneven terrain or for prolonged ambulation. (R. at 23.) The ALJ found Ferry could occasionally climb, balance, kneel, stoop, crouch and crawl; and she must avoid concentrated exposure to vibration, pulmonary irritants, chemicals and hazards, such as moving machinery or heights. (R. at 23.) He found Ferry could perform simple, routine, repetitive tasks in a work environment free of fast-paced production requirements, involving simple, work-related decisions with few, if any,

workplace changes, no interaction with the public and occasional interaction with co-workers. (R. at 23.) In reaching this finding, the ALJ stated that Mullins's opinions contained in her assessments of Ferry's work-related abilities were not persuasive because they were far more limiting than supported by the evidence of record and were inconsistent with her own findings. (R. at 28.)

On July 24, 2018, Mullins opined that Ferry could occasionally lift and carry up to five pounds and up to three pounds frequently. (R. at 1189.) Mullins stated that Ferry could stand and walk only two hours total in and eight-hour workday and could do so only 15 minutes at a time and sit for only four hours total and 30 minutes at a time. (R. at 1188-89.) Mullins stated that Ferry could never climb, kneel, crouch, stoop, balance or crawl. (R. at 1188.) Mullins listed no medical findings to support the above restrictions (R. at 1188-89.)  She stated that Ferry's ability to reach, to handle, to feel, to push/pull, to see and to speak all were affected by her pain, addiction and nervousness. (R. at 1188.) Mullins stated that these limitations were based on low back pain, alcohol addiction and anxiety. (R. at 1188.) Mullins further stated that Ferry was restricted from working around heights, chemicals, fumes, moving machinery, dust, humidity, temperature extremes, noise and vibration as a result of her alcohol addiction, nervous shaking and panic episodes. (R. at 1190.) Mullins also stated that Ferry would miss more than two days of work a month due to her impairments or treatment. (R. at 1190.)

On November 27, 2019, Mullins opined that Ferry could occasionally lift and carry up to five pounds and up to three pounds frequently. (R. at 1727.) Mullins stated that Ferry could stand and walk only two hours total in and eight-hour workday and could do so only 30 minutes at a time and sit for only three hours total and 30 minutes at a time. (R. at 1727-28.) Mullins stated that Ferry could never climb, kneel, crouch, stoop, balance or crawl. (R. at 1728.) She stated that Ferry's

ability to reach, to handle, to feel and to push/pull all were affected by her chronic low back pain, nervousness and shaky hands. (R. at 1728.) Mullins further stated that Ferry was restricted from working around heights, chemicals, fumes, moving machinery, dust, humidity, temperature extremes, noise and vibration as a result of her chronic back pain, anxiety, nervousness, shaking hands and panic attacks. (R. at 1729.) Mullins also stated that Ferry would miss more than two days of work a month due to her impairments or treatment. (R. at 1729.)

Mullins also opined that Ferry had a moderate or more than a slight limitation, but still was able to function satisfactorily, in her ability to follow work rules, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 1724-25.) Mullins opined that Ferry had a seriously limited or no useful ability to perform all other occupational, performance and personal/social adjustments due to anxiety, shaking hands, panic attacks and limitations in her thought organization and comprehension. (R. at 1724-26.) She stated that Ferry, on average, would be absent from work more than two days a month. (R. at 1726.)

As stated above, the ALJ found Mullins's opinions not persuasive because they were far more limiting than supported by the evidence of record and were inconsistent with the her own findings. (R. at 28.) I find that the substantial evidence of record supports the ALJ's consideration of Mullins's opinions. Mullins claimed the limitations she placed on Ferry were due, in part, to chronic back pain and shaky hands. Yet, the only mention of back pain in any of Mullins's medical reports is when Ferry denied any back pain. Mullins also makes rare mention of Ferry experiencing tremors or shaky hands.

Consultative examiner Dr. Brown noted, in May 2019, that Ferry was in no acute distress and ambulated without assistance. (R. at 1713.)  Ferry's gait was

within normal limits, and she had 5/5 grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally. (R. at 1714.) She also had 5/5 strength, bilaterally, in all muscle groups, and her reflexes were normal. (R. at 1714.) Ferry showed no sign of muscle asymmetry, atrophy or involuntary movements, no structural deformity, effusion, swelling, erythema, heat or swelling of any joint. (R. at 1714.) Straight leg raises were negative. (R. at 1714.)

State agency physician, Dr. McGuffin, stated that Ferry could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds and could stand and/or walk and sit about six hours in an eight-hour workday. (R. at 101-02.) He stated that Ferry could occasionally climb ramps/stairs/ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl. (R. at 102.) Dr. McGuffin stated that Ferry had no manipulative, visual, communicative or environmental limitations. (R. at 102.)

While the ALJ found that the opinions of Dr. McGuffin and Dr. Brown were only partially persuasive because the medical evidence provided after these physicians offered their opinions justified a greater degree of limitation, Mullins's own records and the opinions of Dr. McGuffin and Dr. Brown support the ALJ's consideration of the medical evidence and the ALJ's finding as to Ferry's physical residual functional capacity.

Mullins's own records and the opinions of McClain and Smith also support the ALJ's consideration of the psychological evidence and the ALJ's finding as to Ferry's mental residual functional capacity. In November 2019, Mullins opined that Ferry had a seriously limited or no useful ability to perform almost all occupational, performance and personal/social adjustments due to anxiety, shaking hands, panic

attacks and limitations in her thought organization and comprehension. (R. at 1724-26.)

In November 2018, state agency psychologist McClain opined that Ferry could perform simple work with moderate limitations in her ability to understand, remember or apply information and to concentrate, persist or maintain pace and mild limitations in her ability to interact with others and to adapt or manage herself. (R. at 83.) McClain also stated that Ferry's ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and to work in coordination with or in proximity to others without being distracted by them were moderately limited, and her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to make simple work-related decisions, to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without a unreasonable number and length of rest periods were not significantly limited. (R. at 85-86.) McClain stated that Ferry might have some issues with detailed tasks and concentration, but she would be capable of persisting in simple tasks for two-hour blocks to complete a normal workday/workweek. (R. at 86.)

In May 2019, consultative psychological examiner Smith and psychologist Dietrich stated that Ferry presented a normal level of energy, and her fine and gross motor skills appeared to be within normal limits. (R. at 1721.) They stated that Ferry did not seem limited in her ability to understand and remember general items and concepts, and, thus, should be able to comprehend and follow both simple and detailed job instructions. (R. at 1721.) They stated that Ferry's concentration and

persistence appeared adequate to meet the demands of simple, or some detailed, work-related decisions. (R. at 1721.) They stated that Ferry showed a mildly to moderately limited ability to interact with others in an appropriate manner, but she did not appear limited in her ability to adapt to changes in the workplace, to be aware of normal hazards or to take appropriate precautions. (R. at 1721.)

Based on this, I find there is substantial evidence to support the ALJ's consideration of Mullins's opinions, as well as his findings as to Ferry's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity findings; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Ferry was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Ferry's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     January 12, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE